UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

LiDESTRI FOODS, INC.,

                Plaintiff,

      - v –

7-ELEVEN, INC.,

               Defendant.

Civil Action No. 6:17-cv-06146-FPG

---

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT 7-ELEVEN, INC.'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

CALIHAN LAW PLLC
Robert B. Calihan
*Attorneys for LiDestri Foods, Inc.*
16 E. Main St., Suite 620
Rochester, New York 14614
Tel: (585) 281-2593
Fax: (866) 533-4206
rcalihan@calihanlaw.com

# TABLE OF AUTHORITIES

**Cases**

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) .................................................................. 7

Bader v. Wells Fargo Home Mortg., Inc., 773 F Supp 2d 397, 415 .............................. 16

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572 ........................................................ 7, 10

Bild v. Konig, Case No. 09-CV-5576 (ARR) 2012 WL 13109964 (E.D.N.Y. Dec. 20, 2012) ..... 8

Brighton Inv., Ltd. v. Har-zvi, 88 AD3d 1220, 1223 (3d Dep't 2011) ....................... 9, 13

Capricorn Investors III, L.P. v. Coolbrands Intern., Inc., 886 NYS3d 158, 159 (NY App. Div. 1st Dept. 2009) ........................................................................................................... 16

Ciaramella. v Reader's Digest Assn., 131 F3d 320, 322 (2d Cir 1997) 131 F3d at 322 ................. 9

Consarc Corp. v. Mar. Midland Bank, N.A., 996 F2d 568, 576 (2d Cir 1993) ............ 14

Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., 804 F2d 787, 793 (2d Cir. 1986) .... 16

Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011) ....................................... 7

Flores v. Lower E. Side Serv. Ctr., 4 NY3d 363, 371 (2005) ................................... 9, 11

Kaplan v. Vincent, 937 F. Supp. 307, 314 (SDNY 1996) ............................................. 14

Kargo Inc. v. Pegaso PCS, S.A. 2008 U.S. Dist. LEXIS 81888 (SDNY 2008) ...... 13, 14

Kowalchuk v. Stroup, 873 N.Y.S.3d 44, 49 (N.Y. A.D. 1st Dept. 2009) ..................... 7, 8

Longo v. Shore & Reich, Ltd., 25 F3d 94, 97 (2d Cir. 1994) ....................................... 14

Padovano v. FedEx Ground Package Sys., No. 16-CV-17-FPG, 2016 U.S. Dist. LEXIS 167577, at *6-7 (W.D.N.Y. Dec. 5, 2016) ............................................................................. 7

R.G. Group, Inc. v. Horn & Hardart CO., 751 F2d 69,75 (2d Cir. 1984) ................ 13, 16

Scheck v. Francis, 26 N.Y.2d 466 (1970) ....................................................................... 8

Security Plans, Inc. v. CUNA Mut. Ins. Soc., 769 F3d 807, 816 (2d Cir. 2014) ......... 16

Wilson v. Dantas, -- NYS3d --, 173 A.D. 3d 460, (NY App. Div. 1st Dept. 2019)...................... 16

Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1988)................................ 8


**Other Authorities**

https://www.texasbar.com/AM/Template.cfm?Section=articles&Template=/CM/HTMLDisplay.cfm&ContentID=%2041502 ………………………………………………………...……11, 12


RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981)) …………………………...………….16

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

LiDESTRI FOODS, INC.,

                                 *Plaintiff*,

       - v -                             Civil Action No. 6:17-cv-06146-FPG

7-ELEVEN, INC.,

                                *Defendant.*

---

LIDESTRI FOODS, INC.'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT 7-ELEVEN, INC.'S
MOTION TO DISMISS SECOND AMENDED COMPLAINT

PRELIMINARY STATEMENT

This Court has held that LiDestri's First Amended Complaint ("FAC") adequately pled an oral agreement. (Decision and Order dated March 21, 2018, Dckt. # 19). The FAC alleged that in late 2014 and early 2015 7-Eleven and LiDestri negotiated and entered an oral agreement, their oral agreement included 7-Eleven's promise to provide LiDestri reasonably accurate ice tea demand forecasts and LiDestri's promise to produce sufficient tea to meet those forecasts, and 7-Eleven started its performance under their oral agreement by providing LiDestri ice tea forecasts on January 29, 2015 and again in late February 2015. (FAC ¶¶ 22, 24). The Second Amended Complaint ("SAC") at issue here contains those same oral agreement allegations. (SAC ¶¶ 24, 31).

The oral agreement was fair to both sides, which is why LiDestri agreed to its terms and made the substantial investment required to produce 7-Eleven ice teas. After LiDestri had started producing ice teas to meet 7-Eleven's January and February 2015 projections, 7-Eleven had LiDestri over a barrel. 7-Eleven then used its stronger negotiating position to extract new and

highly favorable terms in what was to be a written agreement replacing the parties' initial oral agreement. As 7-Eleven boasts in its August 1. 2019 Memorandum Of Law In Support Of Law In Support of Its Motion to Dismiss LiDestri's Second Amended Complaint ("7-Eleven Mem.") the express terms of the Proprietary Product Purchase and Distribution Agreement ("PPP") signed by LiDestri's Tony Bash ("Bash PPP") on June 4, 2015 did not require 7-Eleven to purchase anything from LiDestri. It limited damages available for breach of the agreement. And it required the parties to litigate any disputes in Texas under Texas law – onerous terms for any supplier, especially one located far from Texas in Rochester, New York, where it enjoys important protections under New York law not afforded by Texas law.

LiDestri does not dispute that it signed the PPP containing those onerous terms, as it had to, having already invested heavily in an ice tea production line. But then LiDestri caught a lucky break. After signing the PPP in June 2015 – more than four months after 7-Eleven and LiDestri had started performing under the parties' oral agreement - Bash returned the PPP to 7-Eleven "for countersignature and to be returned [to LiDestri] to make it effective." (SAC ¶ 78). Fortunately for LiDestri, 7-Eleven dropped the ball. 7-Eleven lost the Bash PPP, never countersigned it, never returned it to LiDestri, and never referred to it again, leaving the parties' much fairer original oral ice tea agreement in place. (See generally ¶¶ SAC 78-94).

Any doubt regarding the status of the Bash PPP was resolved by 7-Eleven's conduct in this action. LiDestri brought this action asserting its oral agreement claims within months of the parties' relationship ending – when memories were fresh and files presumably complete. 7-Eleven's first two Rule 12(b)(6) motions never mentioned the Bash PPP. And 7-Eleven never

sought to enforce the Bash PPP's choice of Texas law or exclusive Texas venue provisions, waiving any reliance on the Bash PPP.[1] (SAC ¶¶ 92-94).

Now, after almost three years of litigation, 7-Eleven for the first time asks this Court to do what 7-Eleven failed to do over four years ago – close the loop by treating the Bash PPP as if 7-Eleven had countersigned and returned it to LiDestri "to make it effective." (SAC ¶ 78). Because 7-Eleven never completed that process, the parties' oral agreement, which the Court has already held was adequately pled in the SAC, remained intact.

## COUNTERSTATEMENT OF FACTS

A. <u>7-Eleven Ignores Key SAC Allegations Regarding the Bash PPP</u>

7-Eleven's MTD ignores SAC allegations showing that both parties had started performing under their oral agreement more than four months before the June 2015 Bash PPP.

> "[P]ursuant to their agreement, 7-Eleven provided LiDestri schedules of 7-Eleven store demand for LiDestri ice tea." (SAC ¶ 25).
>
> "On January 29, 2015 Kyle Swayze of 7-Eleven sent Tony Bash at LiDestri … a jug tea demand forecast. (Ex. A)" (SAC 31).

---

[1] Paragraphs 19-29 of the May 13, 2019 declaration of Robert B. Calihan, Dckt. # 41, describes Mr. Calihan's discovery of the Bash PPP and his informing 7-Eleven counsel of it. In footnote 2 of its memorandum, 7-Eleven claims it is seeking discovery regarding LiDestri's efforts "if any" to determine whether a written contract existed before initiating this action, and notes that LiDestri has refused to provide any information in response to those requests. The simple answer is that there never was a written contract because 7-Eleven failed to provide final internal review and approval of the Bash PPP and to countersign and return the Bash PPP to LiDestri.

Unwilling to conceded that rather obvious point, and seeking litigation advantage, in an April 8, 2019 letter 7-Eleven demanded discovery of LiDestri's pre-litigation fact investigation regarding any such written contract – discovery that would consist largely if not entirely of privileged attorney client communications and attorney work product. By letter dated May 8, 2019, LiDestri counsel demonstrated that 7-Eleven's April 8 letter relied on an inapplicable body of law. LiDestri closed its May 8 letter by demanding that 7-Eleven withdraw its improper requests, and offered to discuss the issue with 7-Eleven counsel. Complete silence from 7-Eleven followed, until footnote 2 of its memorandum. See Generally September 3, 2019 Calihan Declaration.

3

"[I]n our about late February 2015 Swayze provided LiDestri an updated demand schedule. (Ex. B)" (Id.).

"During the negotiations the parties were already performing under their oral agreement and in reliance on 7-Eleven's oral promises. The parties' performance included: Developing the unique teas for sale to 7-Eleven and its franchisees (through the 7-Eleven distributor)." (SAC ¶ 72).

"LiDestri building a new production line for the 7-Eleven teas and acquiring the materials required for the production and shipment of the teas." (SAC ¶ 73).

"7-Eleven preparing and providing the tea demand forecasts that 7-Eleven had agreed to provide and LiDestri had agreed to follow in its 7-Eleven teas production. "(SAC ¶ 74).

"LiDestri production of the 7-Eleven teas, and sales of those teas to 7-Eleven and its franchisees through the 7-Eleven distributor." (SAC ¶ 75).

7-Eleven's MTD also ignores extensive SAC allegations that demonstrate the parties never intended a PPP signed by one party but not countersigned and returned to be binding:

"LiDestri's Tony Bash signed the PPP and sent it to 7-Eleven for countersignature and to be returned <u>to make it effective</u>." (SAC ¶ 78).

"7-Eleven never returned a countersigned PPP to LiDestri." (SAC ¶ 79).

"Neither party referred to the Agreement after Bash sent the Bash PPP to 7-Eleven during the time LiDestri was producing the teas for 7-Eleven." (SAC ¶ 84).

"A year after Bash sent 7-Eleven the Bash PPP, the parties agreed to add a new single serve ice tea line to the LiDestri offering. The Bash PPP provides that 'the list of Products covered by this Agreement as of the Effective Date is attached hereto and set forth in Exhibit A' and that it could only be amended 'by the mutual written agreement of the parties, signed by a Vice President or President.' While the parties added this new ice tea line to the LiDestri offering, the Bash PPP was never amended to include that new product." (SAC ¶ 85).

"In May 2016 the parties' entered a letter agreement intended to amend the existing agreement between them. It nowhere referred to the Bash PPP." (SAC ¶ 86).

4

"The letter agreement identified the agreement between the parties it was amending as the 'Product Supply Agreement' and left blank the line for the date of the agreement being amended." (SAC ¶ 87).

"In the Fall of 2016, LiDestri increased the price on one of its teas for 7-Eleven, effective immediately. In response, 7-Eleven did not cite to the Bash PPP which contained a provision regarding a 90-day notice for price adjustments." (SAC ¶ 88).

"The Bash PPP required 7-Eleven to pay LiDestri for various on-hand materials and product at the end of their relationship." (SAC ¶ 89).

"At or around the time of termination of the ice tea lines, LiDestri demanded payment for raw materials, but never cited the Bash PPP. Although 7-Eleven refused the request, it too never cited the Bash PPP in connection with its refusal." (SAC ¶ 90).

"The Bash PPP unambiguously obligated 7-Eleven to buy back unused bottles, caps and labels. Although 7-Eleven would owe LiDestri $635,105.71 pursuant to that buy-back provision, LiDestri never requested payment for those items in the normal course pursuant to the Bash PPP." (SAC ¶ 91).

"The Bash PPP provides, among other things, for choice of Texas law and mandatory venue 'for purposes of this agreement' in Dallas Texas." (SAC ¶ 92).

"Following the initiation of this action in the United Stated District Court for the Western District of New York, 7-Eleven never contended that the action should be transferred to Dallas, Texas." (SAC ¶ 93).

"Despite briefing and filing two prior motions to dismiss, 7-Eleven did not seriously contend that Texas law should govern this dispute and only mentioned that it did not 'necessarily agree that New York law applied here' in footnote 4 of their reply brief." (SAC ¶ 94).

"On information and belief, 7-Eleven requires that proposed contracts such as the PPP, once they are in their final form, are to receive a final review and approval by the 7-Eleven legal department and then be forwarded to a 7-Eleven Vice President (or higher) for signature." (SAC ¶ 80).

"On information and belief, the internal 7-Eleven procedures set forth above were not followed by 7-Eleven with the Bash PPP." (SAC ¶ 81).

"On information and belief, 7-Eleven lost the Bash PPP and still cannot find it." (SAC ¶ 82).

> "On information and belief, 7-Eleven did not intend for the Bash PPP to become a binding contract until it received final review by the 7-Eleven law department and the countersignature of a 7-Eleven Vice-President or higher." (SAC ¶ 83).

B. The SAC Alleges a Plausible Series of Occurrences

7-Eleven argues that the parties could not have entered into the alleged oral contract because the Bash PPP's terms were so different from the oral contract's terms. In fact, the series of events alleged in the SAC are entirely plausible: LiDestri and 7-Eleven businesspeople met and reached a simple oral agreement that was fair to both parties. (SAC ¶ 24). Both LiDestri and 7-Eleven started performing under that oral agreement. (SAC ¶¶ 72-75). At the same time, the parties started negotiating a written agreement. (SAC ¶¶ 70-71). Trusting that 7-Eleven would honor its oral promises, LiDestri went ahead and built a new production line, started producing teas for 7-Eleven and selling those teas to 7-Eleven and its franchisees. (SAC ¶ 75). Once LiDestri had made those considerable investments, and after both sides had been performing under their oral agreement, 7-Eleven had considerable negotiating leverage over LiDestri. The successive drafts of the PPP became increasing favorable to 7-Eleven, and the final Bash PPP differed considerably from the parties' original oral agreement, reflecting 7-Eleven's stronger negotiating position.

At trial, Giovanni LiDestri will explain to the jury that at the end of those PPP negotiations he authorized Bash to sign the document because LiDestri had already made the considerable investment in building a new line to produce the 7-Eleven ice teas and, based on his over 50 years in the food production industry and his conversations with 7-Eleven representatives whom he trusted, he believed:

> "[T]hat even if the parties adopted the PPP, 7-Eleven would perform in good faith, fairly dealing with one another, including in conformance with the shared expectations of the parties as expressed in their verbal agreement, and

6

in accordance with the normal customs and practices of the industry, including making reasonable efforts to ensure that 7-Eleven and its franchisees purchased the LiDestri teas in the predicted quantities that 7-Eleven was providing LiDestri. "(SAC ¶ 77).

ARGUMENT

I.

THE APPLICABLE LAW ON THIS MOTION TO DISMISS

A. The Rule 12(b)(6) Law that Governs Here

The standards for the Court's review on a Rule 12(b)(6) motion to dismiss a complaint are well known:

> A court "must accept as true all of the factual allegations contained in the complaint," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572, and "draw all reasonable inferences in Plaintiff's favor." Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

Padovano v. FedEx Ground Package Sys., No. 16-CV-17-FPG, 2016 U.S. Dist. LEXIS 167577, at *6-7 (W.D.N.Y. Dec. 5, 2016).

B. Whether a Contract Document Signed by One Party Is Enforceable Depends on the Parties' Intent

7-Eleven misstates the law by claiming that the general rule is that a contract is enforceable against the signing party, even if it is not signed by the counter party. (7-Eleven Mem. at 7). The authority it cites for that proposition – Kowalchuk v. Stroup, 873 N.Y.S.3d 44, 49 (N.Y. A.D. 1st Dept. 2009) – recognizes the general rule applicable here, but it is not the rule

7

7-Eleven describes. Rather, Kowalchuk recognizes that whether a contract has been formed depends on the intent of the parties. Kowalchuk relied on Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1988), in which the Court of Appeals for the Second Circuit set forth the controlling principle of law: "In any given case it is the intent of the parties that will determine the time of contract formation." Having mischaracterized Kowalchuk, 7-Eleven then cites Bild v. Konig, Case No. 09-CV-5576 (ARR) 2012 WL 13109964 (E.D.N.Y. Dec. 20, 2012) for the proposition that "the party's signature conclusively demonstrates the party's intention to be bound by the contract." (7-Eleven Mem. at 7-8, emphasis supplied). Once again, 7-Eleven has mischaracterized a court's decision. The Bild court denied cross motions for summary judgment on breach of contract claims, noting that:

> A reasonable juror could conclude that the defendants' signatures – as well as their delivery of the signed copies of the agreements to Roth - constitute objective signs of their intent to be bound by the document. Likewise a juror could find that these signs could bely defendants' subsequent self-serving statements that they never consented to be bound by the terms of the agreement.

If parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs:

> It is well settled that if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed.

Scheck v. Francis, 26 N.Y.2d 466 (1970). Determining whether the parties' intended to be bound only be a written agreement executed by both parties requires "examination of the totality of the circumstances:"

> New York relies on settled common law contract principles to determine when parties to a litigation intended to form a binding agreement. Under New York law, parties are free to bind themselves orally, and the fact that they contemplate later memorializing their agreement in an executed

8

> document will not prevent them from being bound by the oral agreement. However, if the parties intend not to be bound until the agreement is set forth in writing and signed, they will not be bound until then. The intention of the parties on this issue is a question of fact, <u>to be determined by examination of the totality of the circumstances</u>.

<u>Ciaramella. v Reader's Digest Assn.</u>, 131 F3d 320, 322 (2d Cir 1997) 131 F3d at 322 (citations omitted, emphasis supplied).

Not surprisingly, the "totality of the circumstances" includes relevant events that occur <u>after</u> an agreement has been set forth in writing or signed by one but not the other party (hereinafter referred to generally as "subsequent conduct"). See <u>Flores v. Lower E. Side Serv. Ctr.</u>, 4 NY3d 363, 371 (2005) (defendant's compliance with the terms of the written agreement was evidence that defendant intended to be bound by the agreement); <u>Brighton Inv., Ltd. v. Har-zvi</u>, 88 AD3d 1220, 1223 (3d Dep't 2011) ("Given this lack of clarity in the parties' written communications, their intent must be determined by assessing whether the totality of the circumstances, including their course of conduct after [date of alleged contract formation], consistently indicated their mutual belief that an agreement had been reached.").

If there is conflicting evidence as to whether a writing signed by neither – or only one – party is an enforceable contract, the issue of contract enforceability must be determined not on a motion to dismiss but by the trier of fact. <u>Flores v. Lower E. Side Serv. Ctr.</u>, 4 NY3d 363 (2005); <u>Brighton Inc., Ltd. v. Har-zvi</u>, 83 A.D. 3d 1220 (3d Dept. 2011).

II.

THE COURT SHOULD DENY THAT PRONG OF 7-ELEVEN'S MOTION TO DISMISS BASED ON 7-ELEVEN'S CONTENTION THE BASH PPP MUST BE DEEMED AN ENFORCEABLE AGREEMENT

A. The SAC's Allegations Easily Support a Conclusion that it is "Plausible" that the Parties Did Not Intend to be Bound by the Bash PPP Unless 7-Eleven Counter Signed and Returned It.

Section I.A of the 7-Eleven Mem. argues that LiDestri's oral contract claim must be dismissed because the Bash PPP must be deemed an enforceable agreement that replaced the parties' initial oral agreement. The argument fails because the SAC's allegations, especially when all inferences are drawn in favor of LiDestri, make it "plausible on its face" Twombly, 550 U.S. at 570, that the parties never intended for the Bash PPP to be enforceable absent it being countersigned by 7-Eleven and returned to LiDestri.

It is not surprising that the 7-Eleven Mem. ignores the SAC's key allegations: those allegations defeat this 7-Eleven motion. The first critical allegation ignored by 7-Eleven sufficiently establishes for pleading and Rule 12(b)(6) purposes LiDestri's intent that 7-Eleven had to sign and return the Bash PPP for it to become effective:

> LiDestri's Tony Bash signed the PPP and sent it to 7-Eleven for countersignature and to be returned <u>to make it effective</u>.

(SAC ¶ 78).

The SAC's allegations also support the inference that 7-Eleven never intended the Bash PPP to be an enforceable contract because it was never reviewed, approved and executed within 7-Eleven as required by 7-Eleven's own policies and procedures. (See SAC ¶¶ 80-81). These SAC "information and belief" allegations regarding 7-Eleven's internal procedures are important. Assuming they are correct, the Court can be confident that were LiDestri seeking to enforce the Bash PPP against 7-Eleven, 7-Eleven would be insisting the Bash PPP was not

enforceable because it had never received final approval and signature within 7-Eleven. LiDestri has served discovery requests on 7-Eleven regarding these internal 7-Eleven practices generally, and specifically with respect to its internal treatment of the Bash PPP. (Copies attached to September 3, 2019 declaration of Robert B. Calihan).

The parties' subsequent conduct - recognized as relevant by the New York Court of Appeals in Flores v. Lower E. Side Serv. Ctr., 4 NY3d 363, 371 (2005) - confirms the Bash PPP did not become a binding agreement replacing the initial oral ice tea agreement. After 7-Eleven failed to execute and return the Bash PPP, that document simply disappeared. Neither party appears ever to have referred to it again. And 7-Eleven and LiDestri consistently acted as if the Bash PPP did not exist. For example, when the parties added a second line of ice tea, they ignored the Bash PPP provision governing such additions. (SAC at ¶ 85). When they amended their existing agreement, they referred to something called the "Product Supply Agreement" and were unable to provide a date of that mythical agreement. (SAC at ¶¶ 86, 87). When the price of one of the teas was changed, the Bash PPP price increase mechanism was ignored. (SAC at ¶ 88).

Perhaps most tellingly, both parties - to their detriment – took actions that were inconsistent with the PPP. For example, although the PPP provides for Texas law to govern 7-Eleven/LiDestri disputes and for actions such as this one to be venued in Texas, 7-Eleven never sought to have Texas law apply here and never sought to have this action transferred to Texas. That is particularly significant because New York law regarding the implied covenant of good faith and fair dealing strongly supports LiDestri's claims here, while Texas implied covenant of good faith and fair dealing law is generally less favorable to plaintiffs. See, generally https://www.texasbar.com/AM/Template.cfm?Section=articles&Template=/CM/HTMLDisplay.

cfm&ContentID=%2041502 and cases cited therein. Until its SAC, LiDestri never invoked the Bash PPP provision that would entitle it to over $630,000 in unused inventory payments from 7-Eleven. (SAC at ¶¶ 89-91).

The SAC's allegations also strongly support the inference that 7-Eleven never followed its own internal procedures for the review, approval and execution of contracts such as the PPP. (SAC ¶¶ 80-81). These procedures are reflected in the PPP's requirement that it be executed by a 7-Eleven "Vice President Marketing" and that that signature be attested by the "Assistant Secretary" of 7-Eleven. The PPP also required any amendment to be executed by a 7-Eleven president or vice-president. Instead of following these internal procedures and treating the PPP as a binding contract with an important supplier, 7-Eleven lost it, never again referred to it, and still cannot find it.

It is inconceivable that the parties would have engaged in this conduct had they understood and intended that PPP to be a binding agreement. At an absolute minimum, on this motion to dismiss, where all inferences must be drawn in LiDestri's favor, the SAC's allegations of such conduct defeat the 7-Eleven's motion.

### B. The Bash PPP Contains Language Indicating Both Parties Had to Sign for it to Become Effective

In addition to the fact the parties never recognized the Bash PPP as a binding agreement, at least three PPP provisions evidence the parties' intent that both parties had to sign it. (SAC 95, 96). 7-Eleven first challenges the relevance of this final PPP provision:

> IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers or representatives as of the Effective Date.

The signature block that follows requires both the signature of 7-Eleven's "Vice President Marketing" and the attestation to that signature by the "Assistant Secretary" of 7-Eleven. Given that signature block requirement, it is certain that were LiDestri seeking to enforce the Bash PPP against 7-Eleven, 7-Eleven would be contending – and justifiably so – that the absence of signatures by its Vice President Merchandising and Assistant Secretary made the Bash PPP unenforceable. Numerous courts have found this sort of signature language strong evidence of the parties' mutual signature intent. See, e.g. Brighton Inc., Ltd. v. Har-zvi, 83 A.D. 3d 1220 (3d Dept. 2011).

7-Eleven denies the relevance of Bash PPP section 13.06, which contains a warranty and representation that clearly contemplates both parties signing the PPP:

> Supplier and 7-Eleven hereby warrant and represent that the execution…of such party of this Agreement will not interfere…[with any other obligation] to which such party is bound….

The court in Kargo Inc. v. Pegaso PCS, S.A. 2008 U.S. Dist. LEXIS 81888 (SDNY 2008) found a similar representation and warranty indicative of the parties' intent only to be bound by a mutually signed writing.

Finally, section 2.02 of the PPP contains a merger clause that requires that the PPP be modified only in a writing signed by both parties:

> This Agreement may be amended only by the mutual written agreement of the parties, signed by a Vice President or President….

It makes little sense that parties' would insist on PPP amendments being signed by the parties' corporate officers to be effective, while intending the underlying agreement to be effective with only one party's signature, and courts have repeatedly recognized the relevance of such a provision to determining the parties' intent not to be bound by an unsigned or partially signed writing. See, e.g. R.G. Group Inc. 751 F2d 69,73; Kaplan v. Vincent, 937 F. Supp. 307, 314

13

(SDNY 1996) ( merger clause in the written agreement was evidence that parties intended to be bound only by signed writing); Kargo, Inc. v. Pegaso PCS, S.A., 2008 US Dist LEXIS 81888, at *26 (SDNY Oct. 14, 2008) (same).

The fact that the parties may have reached agreement on all the terms of the new agreement does not make it binding if the parties intended not to be bound by a new agreement until the agreement had been executed by both parties:

> [A]lthough this factor (that there are essentially no further issues to negotiate) appears to be a prerequisite for enforcing an *unexecuted* contract … its presence does not foreclose a holding that a proposed agreement is unenforceable because the parties did not intend to be bound until it was in writing and signed. The latter rule holds even if the parties have orally agreed upon all the terms of the proposed contract.

Longo v. Shore & Reich, Ltd., 25 F3d 94, 97 (2d Cir. 1994).

> Whether a contracting party intends not to be bound in the absence of a writing is a question of fact to be presented for resolution to the factfinder at trial. See *S.J. Groves & Sons*, 41 A.D.2d at 584-85; *Buschman*, 35 A.D.2d at 926. We have previously held summary judgment an improper procedural vehicle for determining the parties' intent not to be bound in the absence of written agreements -- even in cases where evidence strongly suggests the contrary.

Consarc Corp. v. Mar. Midland Bank, N.A., 996 F2d 568, 576 (2d Cir 1993).

### III.

### 7-ELEVEN IS NOT ENTITLED TO DISMISSAL OF LIDESTRI'S ORAL CONTRACT CLAIMS EVEN IF THE BASH PPP IS NOT BINDING

Section I.B of the 7-Eleven memorandum presents an alternative argument based on the Bash PPP being unenforceable – in other words nothing more than a draft agreement. 7-Eleven confuses contract law with evidence of contractual intent. If the Bash PPP never became an enforceable contract, the parties' drafting etc. of the Bash PPP is nothing more than evidence that

can be considered in determining in whether the parties entered into an oral agreement months before June 2015. 7-Eleven nonetheless argues that that draft agreement requires the Court to find that the FAC's and SAC's allegations regarding the parties entering and starting performing an oral agreement over four months before Bash signed the PPP are no longer sufficient to support LiDestri's oral contract claim at this pleading stage.

As courts repeatedly hold, whether oral statements or writings form a contract depends on the parties' intent, which is an issue of fact. It is extremely doubtful that Bash's June 2015 execution of a document that 7-Eleven never countersigned, promptly lost and never referred to again is even relevant to the parties' formation of an oral agreement four months earlier. The notion that Bash's June PPP execution of an unenforceable PPP warrants as a matter of law the Rule 12(b)(6) dismissal of LiDestri's claim that four months earlier the parties had entered and started performing an oral agreement borders on the fanciful.

## IV.

### LIDESTRI WITHDRAWS ITS CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH ON THE GROUNDS THAT IT IS SUBSUMED WITHIN THE FIRST CLAIM FOR <u>BREACH OF THE ORAL AGREEMENT</u>

LiDestri withdraws the SAC's second cause of action for breach of contract, and asks that SAC paragraphs 55-59 be deemed included within the first SAC's cause of action.

## V.

### LIDESTRI'S ALTERNATIVE PROMISSORY ESTOPPEL CLAIM <u>SHOULD SURVIVE THIS MOTION TO DISMISS</u>

The Second Amended Complaint adequately alleges an alternative claim for promissory estoppel. The Second Amended Complaint alleges 7-Eleven's clear and unambiguous

representation concerning its efforts to generate demand for the tea (SAC ¶¶ 20, 23, 61), LiDestri's reasonable and justifiable reliance on those representations in building (SAC ¶¶ 33, 62), and LiDestri's injury from its misplaced reliance on 7-Eleven (SAC ¶ 64). See, e.g., Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., 804 F2d 787, 793 (2d Cir. 1986) ("The doctrine of promissory estoppel, as set forth in Section 90 of the Restatement of Contracts and as adopted in New York, has three principal requirements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.'" (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981))).

    7-Eleven's attack on the LiDestri promissory estoppel claim for relief ignores that it is an alternative claim. 7-Eleven also conflates both grounds 7-Eleven relied on in seeking the dismissal of LiDestri's oral agreement claim. First, 7-Eleven cites four authorities that rely on an enforceable contract to defeat a promissory estoppel claim: Bader v. Wells Fargo Home Mortg., Inc., 773 F Supp 2d 397, 415, Security Plans, Inc. v. CUNA Mut. Ins. Soc., 769 F3d 807, 816 (2d Cir. 2014), Wilson v. Dantas, -- NYS3d --, 173 A.D. 3d 460, (NY App. Div. 1st Dept. 2019), Capricorn Investors III, L.P. v. Coolbrands Intern., Inc., 886 NYS3d 158, 159 (NY App. Div. 1st Dept. 2009). While an enforceable Bash PPP might defeat LiDestri's promissory estoppel claim, for all the reasons set forth above, the Bash PPP falls far short of providing any basis for granting a Rule 12(b)(6) dismissal on the ground that it is enforceable.

    7-Eleven also implicitly argues – by citing R.G. Group, Inc. v. Horn & Hardart CO., 751 F2d 69,75 (2d Cir. 1984) – that LiDestri's promissory estoppel claim must be dismissed because the parties' negotiation of the Bash PPP reflects their intent not be bound by any promises that were not contained in a final written enforceable agreement. As noted repeatedly above, this

16

presents an issue of fact that cannot be resolved in a motion to dismiss. Indeed, the R.G. Group decision relied on by 7-Eleven involved a summary judgment motion made only after discovery had been completed, and the R.G. Group decision quoted lengthy deposition testimony in its decision.

## CONCLUSION

For the reasons set forth above, the 7-Eleven motion to dismiss the LiDestri claims for relief based on an oral contract and for promissory estoppel should be denied in their entirety. The LiDestri claim for breach of the implied covenant of good faith and fair dealing should be deemed withdrawn, and the allegations contained in paragraphs 55-59 of the Second Amended Complaint should be deemed to be contained within the Second Amended Complaint's First Cause of Action for Breach of Contract.

Respectfully submitted,

CALIHAN LAW PLLC

By: /s/ Robert B. Calihan
Robert B. Calihan
*Attorney for Plaintiff*
*LiDestri Foods, Inc.*
16 E. Main St., Suite 620
Rochester, New York 14614
Tel: (585) 281.2593
Fax: (866) 533.4206
rcalihan@calihanlaw.com

Dated: September 3, 2019
Rochester, New York