UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LIDESTRI FOODS, INC.,

                                    Plaintiff,

                                                        Case # 17-CV-6146-FPG

v.
                                                        DECISION AND ORDER

7-ELEVEN, INC.,

                                    Defendant.

## INTRODUCTION

Plaintiff LiDestri Foods, Inc. asserts claims against Defendant 7-Eleven, Inc. for breach of contract and promissory estoppel. ECF No. 44. Now before the court is 7-Eleven's motion to dismiss portions of LiDestri's second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF Nos. 44, 47. 7-Eleven's motion to dismiss LiDestri's second amended complaint, ECF No. 47, is GRANTED IN PART and DENIED IN PART. [1]

## PROCEDURAL HISTORY

7-Eleven removed this action from the New York State Supreme Court on March 10, 2017. ECF No. 1. 7-Eleven then filed a motion to dismiss LiDestri's complaint. ECF Nos. 4, 5. In response, LiDestri amended its complaint asserting claims for breach of an oral agreement, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and misrepresentation. ECF No. 9. 7-Eleven then filed a second motion to dismiss. ECF Nos. 12, 13. On March 22, 2018, the Court granted in part and denied in part 7-Eleven's motion to dismiss LiDestri's first amended

---

[1] In its response to 7-Eleven's motion, LiDestri voluntarily withdrew its independent claim for breach of the implied covenant of good faith and fair dealing, which 7-Eleven had moved to dismiss. ECF No. 50 at 15; ECF No. 48 at 14. Accordingly, 7-Eleven's motion with respect to the implied covenant of good faith and fair dealing is denied as moot.

complaint. ECF No. 19. The Court dismissed two of LiDestri's claims, but found that LiDestri properly alleged claims for breach of an oral agreement and promissory estoppel. *Id.*

After 7-Eleven answered LiDestri's first amended complaint, LiDestri filed a second amended complaint on June 17, 2019. ECF Nos. 20, 44. LiDestri's allegations regarding its claims for breach of an oral agreement and promissory estoppel did not significantly change. *See* ECF Nos. 9, 44. LiDestri, however, made several new allegations relating to a draft agreement signed by LiDestri and added a new claim in the alternative for breach of that draft agreement. ECF No. 44. 7-Eleven now moves to dismiss LiDestri's oral agreement and promissory estoppel claim based on LiDestri's allegations related to the draft agreement. ECF Nos. 47, 48.

**RELEVANT FACTS[2]**

### I.    Facts Common to Amended Complaint and Second Amended Complaint

LiDestri manufactures food, beverages, and spirits in New York. ECF No. 44 at ¶ 6. 7-Eleven owns, operates, and franchises convenience stores nationwide. *Id.* ¶¶ 1, 7. The parties began discussing some form of a business relationship in late 2014. *Id.* ¶ 24. During a 2015 sales visit, 7-Eleven told LiDestri that it was "looking for a partner to develop new . . . ice tea products exclusively for 7-Eleven that would be marketed and sold . . . under 7-Eleven's 7 Select Store Brand." *Id.* ¶ 17. After extended discussions, the parties orally agreed:

1.    LiDestri and 7-Eleven would develop and LiDestri would produce "ice tea" exclusively for sale as "7 Select Brand Tea;"

2.    7-Eleven would tell LiDestri how much tea to produce and provide LiDestri with a monthly schedule of amounts of "ice tea" to deliver to the distributor for 7-Eleven's franchisees to meet franchisees' demand for ice tea;

---

[2] The Court takes the following allegations from LiDestri's second amended complaint, ECF No. 44, and accepts them as true to evaluate 7-Eleven's motion to dismiss.

3. LiDestri's output of 7 Select tea would meet 7-Eleven's demand schedules; and

4. 7-Eleven would "do all that was reasonably necessary"—*e.g.*, promote sales, advertise, market, and focus franchisee attention on the 7 Select tea—to generate "sufficient franchisee demand" for the 7 Select tea. "Sufficient franchisee demand" constituted purchase volumes "within the accepted industry deviation" of five to ten percent of the volumes reflected on 7-Eleven's demand schedules.

*Id.* ¶¶ 24, 42 (the "oral agreement").[3]

In early 2015, 7-Eleven provided LiDestri with an initial demand schedule, which it updated shortly after. *Id.* ¶ 31. In reliance on the oral agreement and the demand schedule, LiDestri worked to develop the "ice tea" for 7-Eleven, upgraded a production line, began acquiring large quantities of raw materials and packaging components, and began producing the "ice tea." *Id.* ¶¶ 33, 34. The demand schedule, however, proved to be inaccurate. Only ten percent of the predicted demand materialized. *Id.* ¶ 34. Despite this apparent failure, the parties forged ahead with their relationship. *Id.* ¶¶ 36, 37. In 2016, 7-Eleven again provided demand schedules that proved to be inaccurate (only twenty percent of predicted demand materialized). *Id.* ¶¶ 37, 39.

## II. Newly Alleged Facts

For the first time in its second amended complaint, LiDestri alleges a number of new facts related to "Draft 4 of the Proprietary Product Purchase and Distribution Agreement" (the "draft agreement"). *Id.* ¶¶ 68–70. Prior to the parties' alleged consummation of the oral agreement, LiDestri and 7-Eleven began negotiating a written contract. *Id.* ¶ 70. The parties went through at least four drafts of the written contract, all of which "differed materially from the parties' verbal agreement." *Id.* ¶¶ 71, 76. LiDestri makes no other allegations regarding the contents of the first

---

[3] Beyond stating that the parties agreed "[f]ollowing extended discussions in late 2014 and early 2015," LiDestri does not specify the date of the oral agreement. ECF No. 44 at ¶ 24.

three drafts, but it does attach the fourth draft (the "draft agreement") to its second amended complaint, which is clearly marked "DRAFT" in the footer. *Id.* ¶ 70; ECF No. 44-4 at 4. In contrast to LiDestri's claims regarding the oral agreement, the draft agreement provides:

> No quantities of Products are specifically ordered by this Agreement. Neither 7-Eleven nor the [franchisees] are obligated to purchase any minimum or ongoing quantity of Products under this Agreement, however, during the Term of this Agreement, 7-Eleven will not (directly or through any other Authorized Distributor), receive Products directly or indirectly from any supplier other than Supplier.

ECF No. 44-4 at § 6.01.

The draft agreement does not contain any provision regarding the accuracy of demand schedules or 7-Eleven's obligations to promote the product. *Id.* at 3–18. The draft agreement does, however, state:

> This Agreement including the attached Exhibits constitutes the entire Agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous, written or oral, agreements, representations and understandings of the parties. The parties acknowledge and agree that there are no other representations, agreements and understandings pertaining to the subject matter herein that the parties have relied on in entering into this Agreement other than those stated in this Agreement. This Agreement may be amended only by the mutual written agreement of the parties, signed by a Vice President or President, and this Agreement shall not be deemed to have been amended or any rights waived by any course of dealing or course of performance between the parties.

*Id.* § 2.01.

LiDestri signed the draft agreement, despite the alleged material differences between it and the oral agreement. *Id.* ¶¶ 76, 77. Although LiDestri does not allege the exact date upon which it signed the draft agreement, the agreement's effective date is June 1, 2015 (in the footer, the draft agreement is dated June 16, 2015). ECF No. 44-4 at 3. After signing it, LiDestri sent the draft

agreement to 7-Eleven for countersignature in order to make the agreement effective, but 7-Eleven never returned the draft agreement to LiDestri. ECF No. 44 at ¶¶ 78–83. The draft agreement was not explicitly referenced by the parties again. *Id.* ¶ 84.

Prior to LiDestri signing the draft agreement:

1. The parties developed the 7 Select teas for sale to 7-Eleven and its franchisees through 7-Eleven's distributor. ECF No. 44 at ¶ 72.

2. LiDestri built a new production line for the 7 Select tea. *Id.* ¶ 73.

3. 7-Eleven prepared and provided tea demand forecasts to LiDestri. *Id.* ¶ 74.

4. LiDestri produced the 7 Select teas and sold the teas to 7-Eleven and its franchisees through 7-Eleven's distributor. *Id.* ¶ 75.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, a court must "draw all reasonable inferences in Plaintiff['s] favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

**DISCUSSION**

LiDestri asserts claims for (1) breach of the oral agreement, (2) promissory estoppel, and an alternative claim for (3) breach of the draft agreement. ECF No. 44. LiDestri insists that the draft agreement was not binding and that the parties are instead bound by the oral agreement or promises made by 7-Eleven. *Id.* ¶¶ 42–53, 61–66, 96. LiDestri claims in the alternative that, if the draft agreement was binding, LiDestri is entitled to relief under that agreement. *Id.* ¶¶ 96–101. 7-Eleven moves to dismiss LiDestri's oral agreement and promissory estoppel claims, arguing that those claims are undermined by LiDestri's allegations regarding the draft agreement. ECF No. 44. Because the Court previously held that LiDestri had adequately asserted those claims in its first amended complaint and LiDestri's allegations regarding those claims have not been substantively changed, *see* ECF Nos. 9, 19, 44, the only question is whether LiDestri's new allegations regarding the draft agreement require the Court to revisit that holding.

## I. Breach of Oral Agreement

### A. *Legal Background*

"As a general rule, in order for an acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous and unequivocal." *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 47 (App. Div. 2009).[4] The parties are generally free to agree on the method of acceptance; accordingly, "[i]t is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed." *Id.*; *see also R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984) (citing *Scheck v. Francis*, 260 N.E.2d 493, 494 (N.Y.

---

[4] The parties assume that New York law applies for purposes of 7-Eleven's motion, which is "sufficient to establish the applicable choice of law." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 514 n.4 (2d Cir. 2001).

1970)). Conversely, parties may enter a binding oral agreement even if "the parties contemplate memorializing their contract in a formal document." *R.G. Group*, 751 F.2d at 74 (citing *Mun. Consultants & Publishers, Inc. v. Town of Ramapo*, 390 N.E.2d 1143, 1144–45 (N.Y. 1979)).

"[T]he question of whether or not a binding contract exists 'is not dependent on the subjective intent' of either party." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1010 (2d Cir. 1996) (quoting *Brown Bros Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977)). "Instead, what matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances." *Id.* (internal quotations and alterations omitted).

Courts in this circuit applying New York law generally examine four factors to analyze whether parties intended to be bound by a less-than-fully executed agreement or an oral agreement that they intend to commit to writing:[5] "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).

---

[5] Courts will sometimes refer to an initial agreement as a binding "preliminary agreement." *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005). Binding preliminary agreements come in two varieties. Parties enter a "Type I" preliminary agreement if they have agreed on "all the issues perceived to require negotiation." *Id.* Such an agreement "binds both sides to their ultimate contractual objective." *Id.* (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)). Parties enter a "Type II" preliminary agreement if they have agreed "on certain major terms, but [have] le[ft] other terms open for further negotiation." *Id.* Such agreements merely obligate the parties "to negotiate . . . open issues in good faith in an attempt to reach the . . . objective within the agreed framework." *Id.* (quoting *Adjustrite*, 145 F.3d at 548). LiDestri's allegations place the oral agreement squarely in the Type I category. *See* ECF No. 44 at ¶¶ 24, 70; ECF No. 50 at 6. Because LiDestri's allegations and arguments are inconsistent with a Type II agreement, the Court analyzes the oral agreement only as a Type I preliminary agreement. *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 549 n.5 (2d Cir. 1998) (noting that a claim for breach of a Type II preliminary agreement was not before the court where plaintiff made no such argument and did not allege the existence of such an agreement).

Although these factors are helpful, the intent of the parties remains paramount. *Id.*; *Vacold LLC v. Cerami*, 545 F.3d 114, 125 (2d Cir. 2008) ("[W]e remain mindful that these factors help us identify categories of facts that are often useful in resolving disputes of this sort, but they do not provide us with a talismanic scorecard. The ultimate issue, as always, is the intent of the parties: whether the parties intended to be bound, and if so, to what extent." (internal quotations omitted)). Accordingly, the factors are not treated equally, and the first factor, which relates to the expressed intentions of the parties, is often deemed the most important. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989). The Second Circuit has even disregarded "considerable partial performance" where the parties' intent was readily determinable from a writing. *Id.* at 73.

As the Court conducts its analysis, it must remain mindful of "two core, but often competing, policy concerns . . . . The first is to avoid trapping parties in surprise contractual obligations that they never intended. The second is the enforcement and preservation of agreements that were intended as binding, despite a need for further documentation or further negotiation." *Brown v. Cara*, 420 F.3d 148, 156–57 (2d Cir. 2005) (internal quotations, alterations, and citations omitted). To successfully toe this line, courts must remain mindful of the parties' intent. *Id.* at 157.

B.     *Application*

LiDestri's oral agreement claim cannot survive unless the parties' both intended not to be bound by the draft agreement and intended to be bound by the oral agreement. If the draft agreement is binding, its merger clause would clearly abrogate the alleged prior oral agreement between the parties. ECF No. 44-4 at § 2.01 ("This Agreement . . . supersedes all prior and contemporaneous, written or oral, agreements, representations and understandings of the

parties."). LiDestri does not dispute this. LiDestri instead argues that the draft agreement is not binding because 7-Eleven never signed the agreement. Conversely, LiDestri maintains that the oral agreement is binding, absent signatures or even a writing. 7-Eleven, by contrast, argues that the draft agreement is binding even absent its signature. 7-Eleven alternatively argues that, if the draft agreement is not binding, the draft agreement's existence shows that the parties did not intend to be bound by an oral agreement.[6]

The Court must analyze the parties' arguments through the prism of the *Winston* factors while carefully drawing all reasonable inferences in favor of finding that the draft agreement is not binding and the oral agreement is binding. Some of the *Winston* factors apply differently to the draft agreement and the oral agreement. LiDestri sufficiently alleges that the draft agreement is not binding, but its allegations also demonstrate that the parties did not intend to be bound by the oral agreement.

### 1.    Express Reservation and Intent of the Parties

The first factor is often deemed the most important. *See Arcadian*, 884 F.2d at 72. "[I]f either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." *Winston*, 777 F.2d at 80. LiDestri has not alleged the existence of any such express reservation here.

---

[6] LiDestri responds to this argument in two paragraphs and makes no reference to case law. ECF No. 50 at 14–15. LiDestri simply argues that the parties' intent to form an oral contract is an issue of fact. It is true that there may be disputed issues of fact related to questions of contract formation, particularly with respect to intent. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 575 (2d Cir. 1993). But, "whether a binding agreement exists is a legal issue, not a factual one." *See Vacold*, 545 F.3d at 123. Where the allegations set forth in the complaint and the incorporated documents demonstrate that the parties did not intend to be bound absent a fully executed, written contract, a court may dismiss a contrary claim. *See CAC Grp. Inc. v. Maxim Grp. LLC*, 523 F. App'x. 802, 805 (2d Cir. 2013) (summary order); *LPD N.Y., LLC v. Adidas Am., Inc.*, No. 15-cv-6360, 2017 WL 1162181, at *13 (E.D.N.Y. Mar. 27, 2017); *Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 445 (S.D.N.Y. 2003).

There are, however, several other objective manifestations of the parties' intent not to be bound absent a fully executed writing. The draft agreement is marked "DRAFT" in the footer of each page. *See O'Connor-Goun v. Weill Cornell Med. Coll. of Cornell Univ.*, 956 F. Supp. 2d 549, 552–53 (S.D.N.Y. 2013) (finding that there were several indications of the parties' "intention not to be bound until [an] agreement was finalized and fully executed," including that the relevant "document [wa]s prominently labeled '**DRAFT**'" (emphasis in original)); *Booth Oil Site Admin. Grp. v. Booth*, No. 98-cv-696, 2010 WL 11549710, at *5 (W.D.N.Y. Apr. 16, 2010) (same). The draft agreement also features signature lines for the parties' representatives. *Brighton Inv., Ltd. v. Har-Zvi*, 932 N.Y.S.2d 214, 214 (App. Div. 2011) (explaining that the parties' inclusion of signature blanks in a memorandum of understanding, among other pieces of evidence, created ambiguity as to whether the parties intended to form a contract absent formal signatures); *see also Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 442 (S.D.N.Y. 2003) (noting that inclusion of signature blocks placed "'importance on the formalities of execution' . . . [and] reflect[ed] a mutual intent on the part of both parties not to be bound to the terms of the agreement until the agreement was executed." (quoting *Winston*, 777 F.2d at 81)).

Finally, the draft agreement includes a merger clause, which is "persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 324 (2d Cir. 1997). In *Ciaramella*, the parties exchanged multiple drafts of a settlement agreement. 131 F.3d at 321. At one point during the negotiation process, plaintiff authorized his attorney to accept the proposed agreement. *Id.* The plaintiff's attorney told the attorney for the defendant that "we have a deal," but the plaintiff decided not to sign the proposed agreement. *Id.* Defendant sought to enforce the proposed agreement, and the district court obliged. *Id.* at 321–22. The Second Circuit, however, reversed. *Id.* at 324. The Second

Circuit concluded that the proposed agreement was not a final agreement because there were "numerous indications in the proposed settlement agreement that the parties did not intend to bind themselves until the settlement had been signed," including a merger clause contained in the parties' drafts. *Id.* at 324. The merger clause provided that the proposed agreement constituted "the complete understanding between the parties" and that "[n]o other promises or agreements shall be binding unless in writing and signed by the parties." *Id.*

Similarly, in *CAC Group*, the Second Circuit found that emails exchanged between the parties established that any agreement "would be effectuated by 'documents,' the details of which were still to be settled." *CAC Grp. Inc. v. Maxim Grp. LLC*, 523 F. App'x 802, 804 (2d Cir. 2013) (summary order). The court's conclusion was "reinforced by language in [a] draft agreement" similar to the language present in *Ciaramella*. *Id.* at 804–05.

In *Dutton*, the Second Circuit overturned a magistrate judge's order enforcing a proposed settlement agreement. *Kaczmarcysk v. Dutton*, 414 F. App'x 354, 354–55 (2d Cir. 2011) (summary order). The Second Circuit reviewed only the first *Winston* factor and found that it militated strongly in plaintiff's favor because a draft of the agreement included a merger clause and a provision stating the agreement would be "effective when it ha[d] been fully executed by all parties." *Id.* at 355. The magistrate judge sought to distinguish *Dutton* from *Ciaramella* by pointing out: (1) that the relevant language in the proposed agreement related "to the agreement's effective date rather than an intention to be bound only by a written agreement;" (2) that "the essential terms of settlement were communicated to the court" on the record; (3) that "several months elapsed" before either party reserved their right not to be bound absent a written agreement and in fact did not include the relevant language in the initial written draft of the agreement; and (4) that the merger clause in the proposed agreement did not contain language indicating that "[n]o other

promises or agreements shall be binding unless in writing and signed by the parties." *Kaczmarcysk v. Acme Contracting LLC*, No. 06-cv-1005, 2009 WL 3739442, at *4–5, *7 (E.D.N.Y. Nov. 3, 2009). The Second Circuit found the magistrate judge's distinctions unpersuasive. *Dutton*, 414 F. App'x at 356.

7-Eleven argues that *Dutton*, *Ciaramella*, and *CAC Group*, require the Court to dismiss the oral agreement based only on the draft agreement's merger clause. The Court does not believe that the presence of a merger clause alone is dispositive.[7] In each of those three cases, at least one additional factor supported the court's finding. Further, other district courts have permitted preliminary agreement claims to proceed even where a merger clause is included in a draft. *See Pretzel Time, Inc. v. Pretzel Int'l, Inc.*, No. 98-cv-1544, 2000 WL 1510077, at *3 (S.D.N.Y. Oct. 10, 2000) ("The fact that plaintiff's counsel added boilerplate language to an otherwise substantively identical version of the oral agreement does not undermine the evidence that the settlement defendants intended to be bound by the oral agreement."); *Pers. Watercraft Prod. SARL v. Robinson*, No. 16-cv-9771, 2017 WL 4329790, at *6–7 (S.D.N.Y. Sept. 1, 2017) (same).

Here, as discussed above, there are objective indications beyond the merger clause that the parties did not intend to be bound absent the execution of a written contract. This is particularly evident with respect to the oral agreement given LiDestri's signature on the draft agreement.

LiDestri claims in its brief that it is plausible it would have signed the draft agreement, which "differed considerably" from the oral agreement, because of "7-Eleven's stronger

---

[7] The Second Circuit has only held that the other three *Winston* factors may be ignored if a party's intent to be bound only by a fully executed agreement is expressed in writing. *Dutton*, 414 F. App'x at 355. The Second Circuit has not held that the presence of a merger clause in a draft alone satisfies this requirement. Such an edict could lead to absurd results, particularly where, as here, the merger clause at issue explicitly contemplates the existence of a prior, oral agreement. *See* ECF No. 44-4 at § 2.01 ("This Agreement . . . supersedes all prior and contemporaneous, written or **oral**, agreements, representations and understandings of the parties." (emphasis added)).

negotiating position" after LiDestri had already made "considerable investments" in reliance on the oral agreement. ECF No. 50 at 6. This explanation makes little sense. If the parties had entered a binding, oral agreement, 7-Eleven would not have "had considerable negotiating leverage over LiDestri" and there certainly would be no reason for LiDestri to sign a written contract that "differed materially" from the oral agreement. ECF No. 44 at ¶ 76; ECF No. 50 at 6. The only plausible explanation for LiDestri's signature is that it did not view the alleged oral agreement as binding. Given these considerations, the first factor strongly suggests that the parties intended to be bound only by a fully executed, written contract.

### 2.    Partial Performance

The second factor examines whether a party has partially performed under a preliminary agreement and whether that performance has been accepted. *R.G. Group*, 751 F.2d at 75–76. Partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts the performance signals, by the act, that it also understands a contract to be in effect." *Id.*

LiDestri alleges that, while they were negotiating the draft agreement, the parties mutually performed their obligations under the oral agreement. ECF No. 44 at ¶ 72. Specifically, (1) the parties developed the teas, *id.*, (2) 7-Eleven prepared tea demand forecasts and provided the forecasts to LiDestri, *id.* ¶ 74, and (3) LiDestri produced the teas and sold them to 7-Eleven and its franchisees through its distributor, *id.* ¶ 75.[8] Accordingly, LiDestri has adequately alleged that both parties performed their obligations under the oral agreement and, by their continued mutual

---

[8] LiDestri also cites its efforts to build "a new production line" and to acquire "the materials required for the production and shipment of the teas." *Id.* ¶ 73. These efforts are mere perpetrations to perform and do not weigh in favor of LiDestri. *Rappaport v. Buske*, No. 98-cv-5255, 2000 WL 1224828, at *7 (S.D.N.Y. Aug. 29, 2000) (citing *R.G. Group*, 751 F.2d at 75)); *Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F. Supp. 2d 287, 296 (E.D.N.Y. 1998).

performance, accepted each other's performance. The parties' mutual performance is an "unmistakable signal" that the parties believed a contract to be in effect. *R.G. Group*, 751 F.2d at 75–76.

With respect to the draft agreement, LiDestri argues that the parties' conduct demonstrates that the parties did not view the draft agreement as binding. LiDestri alleges the parties ignored the draft agreement's terms on multiple occasions.[9] Further, LiDestri claims that the draft agreement was of such little importance that 7-Eleven actually lost the agreement and the parties did not reference it again throughout their relationship. ECF No. 44 at ¶¶ 82, 84. Although there clearly has been performance by the parties, that performance is allegedly consistent with the oral agreement. Such performance is not objective evidence that the parties intended the *draft agreement* to be binding absent execution. *Spencer Trask*, 383 F. Supp. 2d at 443–44 (discounting performance that was consistent with prior agreement that was not in dispute).

The parties' partial performance suggests that the parties intended to be bound to the alleged oral agreement, but drawing all reasonable inferences in favor of LiDestri, the Court finds that this factor does not favor the draft agreement.

### 3.     Agreement on All Terms

The third factor examines whether the parties have reached an agreement on all terms. Even points of disagreement that "may in the long view be fairly characterized as minor or technical"

---

[9] Specifically, (1) the parties added a new tea line but ignored the draft agreement's list of products and amendment provisions, ECF No. 44 at ¶ 85; (2) the parties did not specifically reference the draft agreement in a letter agreement the parties entered in May 2016, *id.* ¶¶ 86, 87; (3) LiDestri raised the price of one of the teas covered by the draft agreement, ignoring its provision regarding price increases, *id.* ¶ 88; and (4) the parties ignored the draft agreement's provisions regarding termination, *id.* ¶¶ 89–91. LiDestri does, however, allege generally that it "satisfactorily performed all of the obligations it would have under the" draft agreement. *Id.* ¶ 98. In construing these allegations in the light most favorable to LiDestri, the Court construes LiDestri's performance under the draft agreement as consistent with its performance under the alleged oral agreement. *Id.* ¶ 43 ("LiDestri honored its obligations under the[] [oral] agreement by producing the teas, and doing all that was reasonably necessary to produce those teas for 7-Eleven.").

can show "that a binding contract was [not] formed prior to the time that they were finally worked out." *Winston*, 777 F.2d at 82. The Second Circuit has recognized that "[t]he actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing." *R.G. Group*, 751 F.2d at 75.

Here, as 7-Eleven points out and LiDestri acknowledges, there are significant differences between the draft agreement and the alleged oral agreement between the parties. ECF No. 44 at ¶ 76; ECF No. 48 at 12–13. One of LiDestri's central claims is that, under the oral agreement, 7-Eleven agreed to take all reasonable steps to generate franchisee demand for the LiDestri ice tea products commensurate with demand schedules 7-Eleven was to provide LiDestri. ECF No. 44 at ¶¶ 11, 19, 20, 24, 44. The draft agreement, however, contains no similar provision, and expressly provides: (1) that "[n]o quantities of [ice tea products] are specifically ordered by this agreement;" and (2) that "[n]either 7-Eleven nor [its franchisees] are obligated to purchase any minimum or ongoing quantity of Products under this Agreement." ECF No. 44-4 at § 6.01. LiDestri does not claim that these provisions of the draft agreement can be read in harmony with the alleged oral agreement. Even drawing all reasonable inferences in favor of LiDestri, this suggests that the parties' alleged oral agreement was not an agreement at all. *Spencer Trask*, 383 F. Supp. 2d at 444.

With respect to the draft agreement, LiDestri's signature on the draft agreement evidences LiDestri's belief that there was nothing left to negotiate. On the other hand, LiDestri alleges that the parties ignored the draft agreement in many respects. *See supra*, note 9. Further, LiDestri alleges that the draft agreement was never approved by 7-Eleven's legal department, a step required by 7-Eleven. ECF No. 44 at ¶¶ 80, 81. It is certainly possible that input from 7-Eleven's legal department would have resulted in additional points of disagreement between the parties. *See*

*Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*, No. 05-cv-10528, 2008 WL 4579758, at *9 (S.D.N.Y. Oct. 14, 2008) (noting that, where further authorization was needed from more senior personnel, nothing precluded the possibility that additional issues would be raised); *P.A. Bergner & Co. v. Martinez*, 823 F. Supp. 151, 157 (S.D.N.Y. 1993) (noting that the process of obtaining approval for draft agreement from creditors resulted in changes). Again drawing all reasonable inferences in favor of LiDestri, the Court finds that this factor slightly supports LiDestri's position with respect to the draft agreement.

4. Type of Agreement Committed to Writing

The final factor is whether the agreement is the type that is usually committed to writing. "New York courts have recognized that the 'complexity and duration of [an] alleged agreement' is particularly significant in determining whether it must be reduced to formal writing in order to be fully enforceable." *Brown*, 420 F.3d at 155 (quoting *Warwick Assocs. v. FAI Ins.*, 713 N.Y.S.2d 178, 178 (App. Div. 2000) (alteration in *Brown*)). Complexity is "an indication of whether the parties reasonably could have expected to bind themselves orally." *Ciaramella*, 131 F.3d at 326. In *Ciaramella*, the Second Circuit noted that, while the agreement at issue did "not concern a complicated business arrangement, it d[id] span eleven pages of text and contain[] numerous provisions that will apply into perpetuity." *Id.* The Second Circuit has also indicated that multiple drafts of a written agreement are a sign of complexity. *Winston*, 777 F.2d at 83. Further, the Second Circuit has explained that a "sophisticated party" "could not reasonably have believed that an options package, which both parties hoped would become very valuable, would be fixed and made enforceable in a conversation." *Braun v. CMGI, Inc.*, 64 F. App'x 301, 303 (2d Cir. 2003) (summary order).

Similarly here, the draft agreement is quite complicated. It consists of thirty sections and multiple exhibits. ECF No. 44-4. Even excluding its exhibits, the agreement spans eighteen pages. *Id.* The draft agreement governs many aspects of the parties' relationship ranging in complexity from the length of the agreement to the management of intellectual property and confidential information. *Id.* §§ 1.01, 3.04–.07, 11.01–.03, 16.04, 29.01, 30.02–.04. The parties went through at least four drafts of the agreement. ECF No. 44 at ¶ 71. Further, as in *Braun*, LiDestri apparently believed that the distribution arrangement with 7-Eleven would become extremely valuable. ECF No. 44 at ¶ 10. LiDestri allegedly undertook substantial capital investment in order to fulfil its obligations under the agreement and now alleges $3 million in damages. ECF No. 44 at ¶¶ 1, 5, 33, 73. LiDestri is also a sophisticated party. ECF No. 44 at ¶ 6. Complicated and potentially lucrative agreements between sophisticated parties are typically committed to writing. LiDestri makes no industry-specific allegations or arguments to the contrary.[10] Even drawing all reasonable inferences in favor of LiDestri, the Court finds that the fourth factor favors 7-Eleven with respect to the oral agreement.

With respect to the draft agreement, however, the Court questions whether this factor favors LiDestri. The draft agreement *was* committed to writing and signed by the party seeking to avoid enforcement of the agreement (LiDestri). *See Robinson*, 2017 WL 4329790, at *9. Drawing all reasonable inferences in favor of LiDestri and given the agreement's complexity, however, the Court finds that this factor is neutral.

---

[10] LiDestri makes multiple allegations regarding food and beverage industry practices for store brand programs, but does not allege that it is common practice in the industry to enter such relationships via oral agreements. ECF No. 44 at ¶¶ 2, 11, 24, 25, 32, 77.

5. The Balance of the Factors Favors Dismissal of the Alleged Oral Agreement

Given its representative's signature on the draft agreement, LiDestri is caught arguing on the one hand that the draft agreement is unenforceable absent 7-Eleven's countersignature while simultaneously arguing that the Court should enforce the oral agreement without either party's signature or even a writing. It may be possible for a litigant to plausibly thread allegations through such a proverbial needle eye, but LiDestri has not. Instead, LiDestri's allegations show that the parties did not intend to be bound to either the draft or the oral agreement.

With respect to the draft agreement, three of the *Winston* factors support LiDestri's position and the fourth is neutral. Drawing all reasonable inferences in LiDestri's favor, the Court finds that the draft agreement is not necessarily binding.

With respect to the oral agreement, however, three of the four *Winston* factors support 7-Eleven's position. The parties' partial performance of the alleged oral agreement strongly favors LiDestri's position, but other courts have dismissed preliminary agreement claims even where partial performance weighed against dismissal. *Spencer Trask*, 383 F. Supp. 2d at 444–45 (granting dismissal of contract claim where partial performance slightly favored plaintiff); *Adidas*, 2017 WL 1162181, at *13 (granting dismissal of breach of contract claim where partial performance slightly favored plaintiff and the fourth factor was neutral). In those cases, partial performance only "slightly" weighed against dismissal, but the Second Circuit has ignored "considerable partial performance" where the parties' intent was readily determinable from a writing. *Arcadian*, 884 F.2d at 73; *see also Dutton*, 414 F. App'x at 355–56 (ignoring partial performance factor); *Kargo*, 2008 WL 4579758, at *9 ("[T]he second factor of partial performance is not dispositive, and in some cases it is given little weight.").

Even examining LiDestri's allegations in the light most favorable to LiDestri, the parties' intent is determinable from the draft agreement that LiDestri signed: they did not intend to be bound to the alleged oral agreement. The considerable partial performance of the oral agreement alleged by LiDestri is outweighed by its signature on the draft agreement. That conclusion is buttressed by the balance of the remaining *Winston* factors. Accordingly, 7-Eleven's Motion to Dismiss LiDestri's oral agreement claim is GRANTED.

## IV.  Promissory Estoppel

A plaintiff must prove three elements for a promissory estoppel claim under New York law: "1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." *Baguer v. Spanish Broad. Sys., Inc.*, No. 04-cv-8393, 2007 WL 2780390, at *5 (S.D.N.Y. Sept. 20, 2007) (quotation omitted). Like LiDestri's oral agreement claim, the Court has previously concluded that LiDestri adequately alleged these elements. ECF No. 19 at 10–11. 7-Eleven argues that LiDestri's new allegations require the Court to dismiss the claim because the draft agreement's terms render any reliance on 7-Eleven's alleged promises unreasonable. ECF No. 48 at 15–16. The Court disagrees.

7-Eleven's argument appears to assume the enforceability of the draft agreement. *Id.*; ECF No. 52 at 5–6, 10. In all but one of the cases cited by 7-Eleven, the courts rely on an enforceable contract. *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 414–15 (S.D.N.Y. 2011); *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 816–17 (2d Cir. 2014); *Wilson v. Dantas*, 103 N.Y.S.3d 381, 382–83 (App. Div. 2019); *Capricorn Inv'rs III, L.P. v. Coolbrands Int'l, Inc.*, 886 N.Y.S.2d 158, 159 (App. Div. 2009). Because the Court has already concluded that the draft

agreement was not necessarily a binding contract for purposes of 7-Eleven's motion to dismiss, these cases do not support 7-Eleven's argument.[11]

7-Eleven also cites *R.G. Group*. 751 F.2d at 79. In that case, the Second Circuit affirmed the district court's dismissal of a promissory estoppel claim via summary judgment. The court explained that "the entire history of the parties' negotiations made it plain that any promise or agreement at that time was conditional upon the signing of a written contract." *Id.* There could not be "a clear and unambiguous promise" under such circumstances. *Id.*

LiDestri has not alleged a history of negotiations demonstrating "that any promise or agreement . . . was conditional upon the signing of a written contract." *R.G. Group*. 751 F.2d at 79. LiDestri alleges that the relevant promises were made either in late 2014 or early 2015. ECF No. 44 at ¶¶ 23, 24. The draft agreement, which is the parties' fourth draft, is dated June 1, 2015. ECF No. 44-4 at 3; ECF No. 44 at ¶ 71. Interpreting its allegations in the light most favorable to LiDestri, LiDestri's new allegations do not change the Court's prior conclusion that LiDestri has adequately alleged a promissory estoppel claim. *See Spencer Trask*, 383 F. Supp. 2d at 445, 448 (granting motion to dismiss breach of preliminary agreement claim, but denying motion to dismiss promissory estoppel claim).

Accordingly, the Court finds that LiDestri continues to adequately assert a claim for promissory estoppel, and 7-Eleven's Motion to Dismiss this claim is DENIED.

---

[11] The Court previously noted that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." ECF No. 19 at 10 n.3 (quoting *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 654 (E.D.N.Y. 2012) (citation omitted)). But also explained that the issue of a valid contract was in dispute, so LiDestri could continue to assert its promissory estoppel claim. *Id.* Because there is still a dispute regarding the existence of a valid contract, LiDestri may continue to assert its promissory estoppel claim.

**CONCLUSION**

Defendant's motion to dismiss the second amended complaint, ECF No. 47, is GRANTED

IN PART and DENIED IN PART. Plaintiff's oral agreement claim is DISMISSED, but Plaintiff's

promissory estoppel claim, as well as its alternative claim for breach of the draft agreement, may

proceed.

IT IS SO ORDERED.

Dated: December 16, 2019
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court